And we will hear again from Mr. Kessler and Mr. Hicks. At least the sitting is efficient in that regard. It's like deja vu all over again as Yogi Berra once said. Once again, Jeff Kessler of Cher Garner in New Orleans. For Mr. Williams, with me is Hannah Brewton, as well as David Durkee of the Downs Law Group. Once again, I'll begin with the prophetic statement in the dissent from Moore v. Ashland Chemical, which noted that the majority opinion was far too rulified for anyone to seriously contend that it does not set broad and eccentric precedents that will profoundly affect the trials and outcomes in substantial numbers of future cases involving injuries and diseases alleged to have been caused by exposure to chemical compounds. Further, that the majority rule will apply in virtually all inhalation cases to exclude the opinions of plaintiff's experts as to causation, and that the majority did not even have a paucity of authority to support that extra gratuitous ratcheting down of inhalation accident victims' chances of recovery. And we have seen that time and time again in the recent BELO cases, none of which a plaintiff expert, no matter how well credentialed, has been able to survive Daubert, and thus the cases are all bounced on summary judgment. Here we have, with respect to Williams, it's arguably even stronger insofar as Dr. Freeman was able to quantify in terms of duration the points at which basically someone would face a heightened risk. He found a dose-response relationship would begin after 12 days of exposure. That's at pages 10-915 and 10-924 of the record. He also found that for every 30 days of exposure, there's a 43% increase in sinus problems. That's at page 10-922 of the record. Mr. Williams worked there for approximately 60 days, well in excess of the 30-day threshold established by Dr. Freeman. He further found that each level increase in the frequency of exposure to tarballs was associated with a 27% increase in the odds of sinus-related symptoms. That's at page 10-922 of the record. And each level increase in the frequency of exposure to dust was associated with a 38% increase in the odds of sinus symptoms, page 10-922. Again, we have the situation where we cannot define with mathematical precision exactly what he was exposed to. It would require just a compilation of data from every single source in the Gulf, every single source onshore, every single day, different times of day. There are too many variables to say with any degree of certainty he was exposed to this number of milligrams of a particular chemical, particular irritant. It simply cannot be done. But what Dr. Freeman did do, using sound scientific methods, was he was able to, in effect, determine an adequate level of dosage where you would see these types of harms occur. That gets back into the statistics, which I just cited. He has a threshold. Pardon me? He has a threshold. Yes. As opposed to the other case where we were dealing with there's no red zone threshold or whatever. Correct, yes. Those are the thresholds. The problem here is that it's a class of chemicals as opposed to one single chemical. And has it ever been enough to have a class of related chemicals that are common in the experience that they could all be there? That's the exact same issue that arose with respect to tobacco in the 1960s. It was a class of chemicals you cannot isolate with specificity and say this particular component in this particular concentration caused this particular disease. What he can say is this class of chemicals did cause it, and he faced a heightened exposure risk based off of his two months working 12-hour days on the Gulf where he was regularly exposed. And again, as with Mr. Ruffin, we contend that the featherweight standard should apply based off the cases which I read to you, the 2R drilling case, valet as well, each of which says that those apply in general cases brought under General Maritime Law and the Jones Act. We're not contending he's a Jones Act seaman, but the case is governed by General Maritime Law as per the Medical Settlement Agreement, as per the location of the BP well, the Deepwater Horizon. Does the opinion hinge on the NIOSH data, which is what the district court determined, and the district court also determined that the NIOSH data wasn't good enough? The district court did point out flaws with the NIOSH data, and here's the thing. Dr. Freeman went above and beyond with respect to his analysis of the NIOSH data. What he did is he issued multiple public records requests to fill in some of the gaps in the data. That is good science. That is proper methodology. The district court, again, was relying on a standard that does not exist and should not exist based off of the gradual misreading of time of Moore and of Allen. In effect, the jurisprudential game of telephone that I mentioned a few minutes ago. He took the NIOSH data, combined the information within it to determine the frequency amongst responders when compared to unexposed participants. That's in Table 1 of his report at page 8118. He used the raw data, filled in the missing information with the information gleaned from his FOIA requests, additional surveys, additional data sets. That's at page 8119 through 8121. And again, based off of that analysis, he was able to determine that a causal relationship existed. He was able to quantify, based off the extent of the duration of exposure, the likelihood of adverse symptoms. He also cited other studies... Counsel, is the district judge's determination that this evidence was unreliable reviewed under abuse of discretion? Are you saying is there any legal error in his assessment of why this particular data was not reliable? I believe the legal error lies in the application, insofar as the judge appeared to be laboring under a misapprehension of sort of the enhanced standard based off the gradual misreadings and misapplications of Allen and Moore, while ignoring the language in cases such as Clark v. Kellogg v. Brown and Root, a published case, as well as Curtis. Those cases obviously have said that you do not need to quantify with... Counsel, I don't see how, for example, his first reason would be affected by that. He said, concern self-reported acute sinus symptoms, not medical diagnosis. Excuse me, the standard, whatever the proper standard is for how you would prove this claim, how does that infuse or infect that ruling? That's an error that should go to the weight... There's still abuse of discretion, though, not legal error. Yeah, but to the extent, it seems, that he's expecting that, well, this study is not exactly proper for gathering this type of data because of the need to quantify precisely, that is where the legal error comes in. You're not turning loose of that, are you? Pardon me? Not turning loose of that argument. Yes, but, and again... I'm not sure, but there are other reasons, and I do think it's important... Yes. ...for us to understand whether we're just going to apply abuse of discretion to that, because that does seem to be key, as our chief said, what he dealt with on this occupational safety data. Right. But he did, the NIOSH study is not the only study upon which Dr. Freeman relied. He also cited the D'Andrea and Reddy study, which was specific to oil spills and dispersants. The Gulf study, the National Institute of Environmental Health Sciences study, which tracked long-term health via follow-ups. The cohort study specific to the Deepwater Horizon oil spill, that's at page 8129. He also referenced the Prestige oil spill studies, which occurred off the coast of Spain. That's at 8131, based off of follow-up surveys of the responders in that instance. He also cited the limitations that are inherent to each of those. Again, with respect, going back to NIOSH, to the extent it's a cross-sectional study, yes, those are relevant to epidemiological methodology. Whether, you know, it may not be the perfect study, but again, that goes back to the quote from the Boca Negro case, the Fifth Circuit case, that says, Real life does not occur in laboratory conditions. Again, with respect to Dr. Freeman, the court applied a much higher standard that could not plausibly be met. He's a well-credentialed scientist. He engaged in proper scientific methods. He went above and beyond. He didn't simply just plug and play the NIOSH data, whatever its limitations may be. He went above and beyond and filled in the gaps through his public records request. Can you talk about the specific causation for just a minute? Okay. About the differential etiology approach?   As far as his... His summary judgment on that point and why wouldn't that be enough to just affirm across the board in this case? Again, with respect to this summary, with respect to the differential etiology, he employed proper methodology. Again, the court is applying an impossibly specific standard, which cannot be... We've seen it in practice. It cannot be satisfied, opposing counsel previously recognized, not aware of any cases within the Fifth Circuit where a BWO plaintiff's expert has survived daubered. That suggests that the problem is in the standard, the application of the standard in particular here. You don't agree that there are other specific flaws in the specific causation analysis? Whatever flaws may be, I think they would go to the weight, not the overall admissibility. I believe one of the points they pointed out was that a different individual's name was used instead of Mr. Williams a handful of times in a 60-page report. Okay, yes, that was a little bit sloppy, perhaps. That's not a reason to keep him out altogether. But again, I go back to the featherweight standard. Again, the cases we'd cited to you, the 2R drilling, valet, etc., apply to general maritime law. As long as we can make a featherweight showing of legal causation, as far as specific causation, general causation, we don't have to... The court should not have been micromanaging the studies and say, well, this study didn't include this particular variable or this type of study, cross-sectional study is not ideal for this. The testimony is there. The evidence is there. Let me ask you about the evidence. Assuming differential etiology analysis requires looking at a closed set, maybe remembering my math incorrectly, but it does seem to me you're looking, what could cause this? And your expert needs to go through the other potential causes that would be relevant to this particular individual and exclude the others. And it does seem to me that the district court was saying this particular study doesn't do that. What's your response? I mean, it does seem to me it's completely unreliable if it's not actually differential analysis. Again, we contend that he did engage in a proper study. He also applied... Proper means to discuss the other possible explanations for it. Did he do that in his study? Yes, and the court may have disagreed with his attempts to distinguish other studies or to address the methodological flaws or limitations, but nonetheless, Dr. Freeman did do that. And the fact that he did do that should have sufficed, especially given the generous featherweight standard that applies. He doesn't have any analysis of these other causes, potential cause. There's no... It's like 2 or 3 sentences or something. There's no analysis of it. No, I mean, again, he went through it as best as he could. There's also, with respect to... In addition, there's Dr. Clark's analysis regarding the dosage as well, the attempt to quantify that. Excuse me. But with respect to Dr. Freeman, his... Again, he went through it using sound scientific principles, sound methodology. Again, he's a highly credentialed consultant in forensic medicine and forensic epidemiology, a well-published professor. I don't think we're talking about his credential. Right. Yes. But with respect to... Certainly, he cited and applied the Bradford Hill Guidelines at pages 8132, 8133 of the record. You know, they're not a checklist of essential criteria, but they're considerations that assist an expert. It's what an expert in the field uses, and that is the touchstone of what Daubert requires, whether they're using sound methodologies and what the experts in the field utilize. He uses that. You know, the district court may have disagreed with how he analyzed certain factors, but it should not have resulted in the wholesale exclusion, just like every other below-point of expert that we have seen. You know, as the court held in Knight v. Kirby, where an expert otherwise reliably utilizes scientific methods to reach a conclusion, the lack of textual support may go to the weight, not the admissibility of the expert's testimony. The door should not have been closed with respect to Dr. Freeman. Again, that also goes back to the standard being used here is far stricter than is used in other circuits. For instance, the First Circuit in Millward, the Sixth Circuit... Already is a circuit split. Correct. So we're not creating, or our decisions, whether or not, if they hold that, they're not creating, or it's already pre-existing. Yes, but, you know, given the split should be resolved, especially given the need for uniformity in general maritime laws the Supreme Court recognized this summer in the Great Lakes case. It's above our pay grade. Understood, understood. But with respect to, again, just wrapping up, I see my time has expired. The court did not faithfully apply what Dawbert required. It went far, far beyond in micromanaging the studies, and all that analysis is based off of a misapplication of what this court originally set out in Moore, in Allen, and the court has recognized in cases such as Curtis and Clark v. Kellogg for Brown and Root that it does not require the heightened level that is required, that was applied here, rather. Thank you. Thank you very much, Mr. Kessler. We have your argument, and you've saved time for rebuttal. And Mr. Hicks, we'll hear from you. Thank you, Your Honor, and may it please the Court, George Hicks for the BP Appellees, again. The general causation opinions of Mr. Williams' experts were properly excluded for any number of reasons. First, like Mr. Ruffin's expert, Mr. Williams' experts never identified a level of exposure to oil, dispersants, or indeed any chemical that can cause Williams' alleged condition, chronic pan-sinusitis, in the general population. Second, his experts failed to reliably identify an association between exposure to the spill and chronic pan-sinusitis. Third, they failed to reliably analyze the Bradford Hill factors that gave rise to a causal connection. And in fact, for all of those reasons, the Eleventh Circuit very recently affirmed the exclusion of Williams' principal causation expert, Dr. Freeman, in the BELO bellwether proceedings in the Northern District of Florida on substantially identical facts. And the same result should follow here. But what is more, Mr. Williams' experts also failed to establish specific causation. Dr. Freeman offered a three-sentence analysis that made no serious attempt to rule out plausible alternative causes of Mr. Williams' alleged... Could this case be decided on that reason alone without getting into the Curtis-Clark-Press dichotomy? Absolutely, Your Honor. Just like the Ruffin case, both cases can be resolved on the specific causation. Here, we have literally a three-sentence differential etiology by Dr. Freeman. He even gave six broad theories as to what possible other causes there could be, but then he then offered one conclusory sentence that basically said, well, he didn't have any preexisting conditions, so therefore it was caused by this. That's a methodological flaw, and that is certainly within the discretion of the district court to conclude that that is... Just a failure to articulate the reasons? I think it's the failure to show your work, Your Honor. It's not about the absolute conclusion reached. It's the fact that he even identified other possible causes, six alternative theories for Mr. Williams' condition, but he didn't discuss what those theories entailed, and then he brushed them all aside for a single reason in a single sentence without trying to explain why. And even Dr. Freeman conceded that the time, the eight years that had passed between the cleanup work and the pan-sinusitis, he'd never seen such a long time span and yet have the condition attributed to earlier exposure. So there's all sorts of, if you want to call it, lack of showing your work. It's not about the bottom-line determination, and this wasn't about the district court improperly weighing the evidence. It's simply that a three-sentence, cursory, vague, conceitedly short-cutted differential ideology is simply insufficient, and I certainly don't think it was manifest error for the district court to conclude that. And I think the only... Judge Elrod, I think you asked my friend about this, and I didn't hear any response. I think he went back to his general causation arguments about the impossibility, et cetera, et cetera. Now, we disagree with those for all the reasons I've already stated, but that's separate and apart from the specific causation failure that we have here, which is simply ruling in and ruling out, and that didn't happen here. It was a three-sentence, perfunctory analysis. And then Dr. Clark, the second causation expert, he even conceded that offering a causation opinion is, quote, way over his expertise. That's at record 885. He admitted that his exposure and risk numbers were not accurate or reliable, and even his incorrect calculations put Mr. Williams' risk 100 times lower than what the EPA finds acceptable. And Dr. Clark couldn't defend this except just to say, well, that's my opinion. That's ipsy-dixit. That's been found insufficient by the Supreme Court. And this is all just the specific causation. I think the only thing I heard my friend talk about was the fact that Dr. Clark also referred to a Mr. Vincent six times. Well, that's not the only problem. I mean, that, I think, is indicative of a rather slipshod analysis, but that's certainly not the only problem with the specific causation analysis here. What would be the harm in us discussing Curtis? I get your specific... I'm going back now to General. Curtis and Clark and saying, to the extent that some of our language has said recently that the precise level of a chemical to which you were exposed needs to be determined or quantified by the expert, that is an over-reading, because under Curtis, the plaintiff need not show the precise level of a chemical to which they were exposed, but the plaintiff does need to show the plaintiff's level of exposure that it was harmful and reiterate that to harmonize some of our unpublished and published case law in this area. Well, Your Honor, I think you can dispose of both of these cases on a number of grounds. You can just find no specific causation. I know. We talked about that as a possible thing in this case. Yes, but as far as... But I'm trying to... You came here to grapple with these general causation points and to talk about the five or six recent cases, but I'm trying to say if we could harmonize them with the other to say, no, you don't have to give a very specific amount, but you do have to show that the level was harmful and cite Curtis and cite Clark that are published and say, to the extent that we said you have to give a... that there's something... You told me these were not statutes, and so to the extent there's loose language that would say you must give a definite amount, that's wrong, but you do have to establish that it's a harmful level. Your Honor, I agree with that. You do have to establish that it is a harmful level. You don't have to... And we've never said... And I don't think the case is bird-pressed. I don't think they say you have to have a precise quantity. Well, to the extent anyone is saying that, that that would be an overstatement. I think my friend is saying that the cases say that. I disagree, but to the extent that you would like to clarify that the cases hold that the plaintiff's excerpt must show a harmful level, and there is a threshold, and that that is a minimal requirement of general causation, I think that that would harmonize the cases. I think also, and this is important, I think that would also continue to put you on the same side as all the other courts of appeals that have required exactly that, the 4th, the 8th, the 10th, and just recently, the 11th Circuit, which cited this court's cases... But wouldn't it be off from the 1st and the 6th? I want to make very clear, there's no circuit split with the 1st and 6th, Your Honor. Okay. I disagree strongly with that. I think if you read the Millward decision, it does not say anything about this particular issue, about the need or the not need to show a harmful level of exposure. It talks about sort of other aspects of a reliable expert opinion. It does not talk about this, and I want to make sure that that's clear. But you certainly would be creating a circuit split with the 4th, 8th, 10th, and 11th Circuits, Judge Bill Pryor's decision just two months ago that said you have to show, as you just said, a harmful level of exposure to cause the alleged condition. That is what you need. And I think, actually, here, I think you'd be creating a circuit split remarkably on the facts. I mean, Dr. Freeman submitted essentially the same report in both this case and the 11th Circuit case. And so to find that, uh, that there was an abuse of discretion here or there was legal error or something like that, then you would really be parting ways with the 11th Circuit. And I don't think you need to go anywhere near that. I think what you just said, which is, no, you don't have to identify a precise, you know, with absolute mathematical precision, and no one's asking for that, but you do have to identify a harmful level. And that concededly was not done here. And that is exactly why I think the plaintiffs are pressing so hard and starting out, you know, with all respect, with a quote by Judge Dennis in dissent. I think that that is sort of a... pretty much a giveaway that they want the law changed. Well, that was in the other case, so... Well, I think he made the same point here and started the argument with the same point as well, uh, you know, with all respect to Judge Dennis. Um... Counsel, let me ask you about the difference, you see. What you say certainly is plausible. It does seem to me whether the term, a specific level, a specific, um, quantified number, or whether it's a threshold, is not necessarily saying something different. Uh, it's either a number or it's not a number. Uh, it's either a way to refer to what actually can cause this particular condition in the general population, not worried about this particular plaintiff, not worried about the particular substances he... particular location in which he encountered these substances. So what would you say is the difference between a specific number and a threshold? I-I don't think that in the sense of having to say, uh, you know, it is this precise number, but I do think that there has to be some... Number. There has to be some quantifiable... I think that's, I think, you know, and whether you want to say quantifiable as a number or however you want to phrase it, there has to be a discrete and understandable and predictable and consistent threshold. And that's why, you know, I want to push back a little bit on this idea that, that, quote, duration can establish the proper threshold, which I think is an argument that my friend has been making. First of all, I want to point out, in this case, that doesn't work because that's entirely drawn from the NIOSH study, which was about acute sinusitis, completely different condition from chronic sinusitis. So you cannot... That is the entire derivation of this duration argument in this case. It comes from something that talks about a different condition. But there's no connection between duration and harmful level. You know, long duration might cause or not cause a particular condition. And again, I want to go back to this idea that I think it's very hard to say that a district court would have abused its discretion if it did not recognize this heretofore unrecognized duration argument. I think what the cases have said, as Judge Elrod pointed out, is there has to be a harmful level. And we're not talking about the specific plaintiff. We're not talking about specific causation. This has nothing to do with whatever the actual plaintiff was exposed to in actuality. And this is made clear in the Byrd case, which I recognize is unpublished, but the analysis there, I think, is still quite cogent and compelling. Which is that general causation is just looking at the literature, looking at the science, defending your work, defending your methodology, showing your work. And here, that simply didn't happen. Putting aside the harmful level issue, I mean, you've got the NIOSH... And this is all pointed out by the 11th Circuit as well, so don't just take my word for it. The NIOSH study, self-reported acute sinusitis, not chronic sinusitis. The D'Andrea and Reddy study, cross-sectional, acute effects, didn't account for smokers. The Rusecki report, nearly every cohort showed no increased risk of chronic sinusitis. And it actually showed a reduced risk. And then the only cohort with significant increased risk turned out to be insignificant once you took smokers out. And the plaintiff here is not a smoker. The only response to this that I saw in Mr. Williams' reply is simply to argue that, well, it doesn't matter that the results were statistically insignificant. Now, there's been a lot of arguments here that are, I think, would be breaking new ground and breaking new law, and that is certainly, you know, the almost naplus ultra of them. The only authority... Well, let's talk about that. Dr. Rothman's amicus brief specifically hones in on this statistical significance point. He says that it can be a misleading indicator of the cause-and-effect analysis and that it seems that causation that is insignificant might be proved by direct testing, according to the amicus brief here. And so he thinks that we're stepping off by requiring statistical significance. I mean, do you have any thoughts on this? I do, Your Honor. I disagree. I don't think that is supported by any case that this court has ever issued. The only authority for that is Dr. Rothman himself, whose approach has been rejected by the Third Circuit. It has only appeared here and in the Eleventh Circuit, I believe, in an 8-4 brief. He says it's a matrix case, matrix initiatives versus Syracuse... I'm sorry, you deal in this every day, and I don't, so I don't know how to pronounce that. Syracuse... We just call it matrix. Okay, thank you. Your Honor, we addressed that in our brief. The matrix is simply inapposite on the facts and on the law. It's a completely different case with all respects. Well, he thinks the science says that our approach is off by looking for statistical significance. I'm sorry, could you answer that? He thinks the science says our approach is off, and we're supposed to be looking at the science, so... Your Honor, I look at your cases, and your cases have put a premium on statistical significance, which I don't think is a crazy idea, you know, to ask for statistical significance rather than statistical insignificance. But again, to be very clear, that's not the only problem here. It's not the only problem with the studies that Dr. Freeman relied on. It's not the only problem with the general causation, and it has nothing to do with the specific causation, which has its own problems. And can we say, back to Judge Southwick's very insightful question about threshold, is it a number? You know, couldn't it be a range, so that you wouldn't say it's the magic number 42 that's the answer to all things, but you would say that it could be 10,000 to 20,000 parts per million or something could be the rate. We don't know if it's 10,001 or... Yeah, I... 18,000 in that. So it's not a precise point. I agree. It doesn't have to be, you know, the end-all, be-all single number, you know, in parts per million for a particular substance, but it has to be something that can guide, I mean, that can provide some consistency and predictability and, frankly, just satisfy what general causation is. General causation is, can, and I don't think there's any dispute about this, can a particular substance cause a particular condition in the general population? I don't know how you can reliably and helpfully answer that question without some sort of statement about, you know, what is the minimum range that we even need to be talking about to be in the ballpark here? I mean, the courts' cases, cases from all over the country, talk about, you know, whether it's fixative denture cream. I mean, you know, in high enough amounts, that can be toxic, but if it's too low, it's not. I mean, I think that's a basic proposition of science, and I don't think it's too much to ask plaintiffs and their experts to be able to look at the scientific literature, apply an appropriate methodology, you know, address the limitations, and determine whether there is an association, and then also, which we don't have here, reliably apply the methodology of the Bradford-Hill factors to then go from association to causation. That's another problem we had here. I didn't almost see any response to that in the reply brief, other than to, again, sort of flyspeck the district court's very careful and thorough explanation of why the Bradford-Hill analysis here was cursory and vague, addressing only a couple of the factors, not addressing the others, very similar to the specific causation. It's not about the weight. It's about the methodology, and the district court is in the position and has the discretion, the substantial discretion, this court has said, to be able to look at that and determine in its role as gatekeeper that that simply doesn't pass muster under Daubert principles. And if there are no other questions, we would ask that the judgment be confirmed. Thank you. Thank you. We have your argument. Thank you. Mr. Kessler, you save time for rebuttal.  I think you hit the nail on the head when you brought up the amicus brief submitted by Dr. Rothman, who also, by the way, had submitted an amicus brief in Daubert, which the court accepted his analysis there. We should follow the science in determining what is reliable scientific methodology, what are reliable scientific principles. The science is moving away from requiring statistical significance as the be-all, end-all of that. His report, he stated... I'm sorry, in his brief, he stated, it is sometimes claimed that a literature or set of results is inconsistent simply because some results are statistically significant and some are not. This sort of evaluation is completely fallacious. We cited the causation and causal inference in epidemiology article in the American Journal of Public Health. The problem we have here is, again, much like the situation we had, you know, a half hour ago with Mr. Ruffin, the court is expecting an impossible standard to be satisfied. Again, with respect to the specific composition of what he was exposed to, you have to... there's many, many variables. Counsel, it does seem to me that there's a tie between general and specific causation that I don't see how it will work under your analysis. It seems to me what you basically want is to say exposure to this particular chemical can cause this particular condition, and we don't have to give you a number. It's just out there in the world. But the way our case law, not just recently, has determined you need to decide on a general causation what level of this particular substance can cause. However you express it, this range, this whatever. But without that, you never get to specific causation that says, was this person exposed to something within or above that level? So it seems to me you're wiping out the ability of specific causation to play off general causation in the way that you want to analyze it, which is basically we don't need to give you the threshold. We just need to show that this particular substance caused this particular condition. Am I misreading your argument? Again, you can still analyze it using scientific principles and make a qualitative determination as far as this was an adequate dosage to result in these types of harms without saying that he needed to be exposed to 17 parts per million for at least 300 hours. But what does adequate mean? What does adequate mean? Based off of observations, based off epidemiological studies. The field of epidemiology, it's inherent that you have to. All that then needs to result in something that you can then tie to specific causation. When you call it a number or whatever, an adequate level, it just seems to me we're playing with words, which is what lawyers and judges do. But nonetheless, you've got to have some level, don't you, in order to have specific causation exposure to that level. Well, I mean, certainly he pointed out specific numbers with respect to the durational analysis that I'd cited to you earlier and concluded that I believe it was a 43% higher rate based off of 30 days of steady exposure. Mr. Williams had double that, approximately 60 days of steady exposure throughout the day. He did quantify it using scientific principles, you know, going above and beyond the NIOSH data, regardless of the criticisms that the district court had of the NIOSH data field. In epidemiology, you almost never have a perfect data set and a perfect, you know, means of testing for your precise situation. That concern is only amplified given the BP context where you have a broad geographic range, the chemical composition may vary based on weathering effects, individual effects, things of that nature. And that's why you see, for instance, with respect to, like, dosage levels, if you were to ask an anesthesiologist what is the appropriate dosage level where someone would have harms, the first thing they would ask is, well, I need to know conditions specific to the patient, you know, their age, their race, their weight, things like that. You can't give a single-figure, one-size-fits-all approach. And the court, to the extent it was relying on misreadings of Allen and Moore, which, as cases such as Curtis and Clark v. Kellogg, Brown v. Rudiff said, do not require that level of specificity. We contend that was a legal error, it was an abuse of discretion, and we ask that it be reversed. Thank you. Thank you very much. We appreciate all the arguments that you have both presented here today that have been very helpful. This case is submitted.